Laurence M. Rosen, Esq. (SBN 219683)
Phillip Kim (pro hac vice)
Jonathan Horne
THE ROSEN LAW FIRM, P.A.
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
lrosen@rosenlegal.com
pkim@rosenlegal.com
jhorne@rosenlegal.com

Counsel for Plaintiff

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KENT JI, Derivatively and on Behalf of SUNTECH POWER HOLDINGS CO., LTD., | CASE No.: 3:12-cv-6409-JST |
| Plaintiff, | |
| vs. | [CORRECTED] VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY |
| ZHENGRONG SHI, DAVID KING, JULIAN RALPH WORLEY, AMY YI ZHANG, SUSAN WANG, AND ZHI ZHONG QIU, | |
| Defendants, | **JURY TRIAL DEMANDED** |
| and | |
| SUNTECH POWER HOLDINGS CO., LTD. | |
| Nominal Defendant. | |

# TABLE OF CONTENTS

Page

I.    **NATURE OF THE ACTION** ...................................................................................1

II.   **PARTIES** ...............................................................................................................4

    A.    PLAINTIFF ....................................................................................................4

    B.    DEFENDANTS ...............................................................................................4

    C.    AUDIT COMMITTEE ......................................................................................5

    D.    IMPORTANT NON-PARTIES ...........................................................................7

III.   **JURISDICTION AND VENUE.** ..........................................................................7

IV.   **DEFENDANTS' MISCONDUCT.** .......................................................................8

    A.    SUNTECH IS FOUNDED, LISTS ON THE NEW YORK STOCK EXCHANGE, OBTAINS ALMOST $2 BILLION FROM U.S. CAPITAL MARKETS, AND COLLAPSES .......................8

    B.    SUNTECH COLLAPSED BECAUSE SHI HAD HOLLOWED IT OUT. ...............11

        1.  **Shi and his wife found Asia Silicon.** ...............................................11

        2.  **Shi and his wife found Glory Silicon.** .............................................14

        3.  **Shi Loots Suntech through Asia Silicon.** .........................................16

        4.  **Shi loots Suntech through Glory Silicon.** ........................................20

        5.  **Shi Loots Suntech through SSS.** .....................................................24

        6.  **Shi attempts to loot Suntech through GSF** ......................................25

            a)  Shi attempts to manipulate Suntech's earnings by funneling Suntech's cash through an exotic accounting company in which he holds a 10.67% interest. ......................................................25

            b)  Suntech bets its balance sheet for GFS and loses. ..................28

    C.    SHI COMMITTED A FRAUD ON THE MINORITY. ..........................................29

        1.  **As a practical matter, Shi controls the majority of shares whose votes are likely to be cast as a result of influence or apathy.** ...............29

a)  Shareholders will not exchange the ADSs for shares. .......................30

b)  Suntech's management is likely to prevent shareholders' attempts to vote their ADSs. ........................................................................30

c)  Shi has taken advantage of his position to commit the company to transactions that benefited him at the expense of Suntech. ................34

1

2

## LIST OF IMPORTANT PERSONS AND ENTITIES

*Suntech entities:*

3

4

5

Suntech Power Holdings Co., Ltd. ("Suntech", or "Suntech Holdings" when referring only to holding company): Holding company, organized under Cayman Islands law, that holds all of Suntech's operating subsidiaries.

6

7

Wuxi Suntech Power Co., Ltd. ("Wuxi Suntech"): Wholly-owned operating subsidiary. Located in Wuxi, China.

8

*Shi and associates:*

9

Zhengrong Shi ("Shi"): Suntech's founder and former CEO.

10

Wei Zhang ("W. Zhang"): Shi's wife.

11

Qiuming Chen: One of Shi's money managers.

12

*Entities owned and controlled by Shi:*

13

14

Asia Silicon Co. Ltd. ("Asia Silicon (BVI)"): Holding company. Holds Asia Silicon (Qinghai). Owned and controlled by Shi.

15

16

Asia Silicon (Qinghai) Co. Ltd. ("Asia Silicon (Qinghai)"): Operating subsidiary. Sells polysilicon to Suntech.

17

Glory Silicon Technology Investments (Hong Kong) Co., Ltd. ("Glory Silicon (BVI)"): Holding company. Holds Glory Silicon (Zhenjiang) through an intermediate holding company.

18

19

Glory Silicon Energy (Zhenjiang) Co. Ltd. ("Glory Silicon (Zhenjiang)"): Operating subsidiary. Sells wafers to Suntech.

20

D & M Technologies, Ltd.: Trust. Owned by Shi.

21

Power Surge Limited: Trust. Owned by Shi.

22

Shanghai Sunland-Shangli Investment Co.: Company located in China. Controlled by Shi.

23

*Global Solar Fund and related entities:*

24

25

Global Solar Fund, S.C.A., Sicar ("GSF"): 79% owned by Suntech, 10.67% owned by Shi. Invests in companies that perform large-scale solar projects in Europe.

26

27

Global Solar Fund Partners, S.a.r.l ("GSF Partners"): Operating entity with day-to-day control over GSF.

28

GSF Capital Pte Ltd. ("GSF Capital"): Parent of GSF Patners.

Plaintiff Kent Ji ("Plaintiff"), alleges the following upon personal knowledge as to his stock ownership, and upon information and belief as to all other allegations:

## I.     NATURE OF THE ACTION

1.     This is a shareholder derivative action that seeks relief on behalf of Suntech Power Holdings Co., Ltd. arising from the defendants' breaches of their fiduciary duties that have substantially injured Suntech.[1]

2.     Suntech was once the world's largest manufacturer of solar panels. At its peak, its market capitalization was over $16 billion.[2]

3.     It is a Cayman Islands corporation that ultimately owns several subsidiaries throughout the world, but whose primary subsidiary is Wuxi Suntech Power Co., Ltd ("Wuxi Suntech"). Wuxi Suntech operates in China.

4.     Defendant Zhengrong Shi ("Shi") was Suntech's CEO until August 2012, when he resigned; he was its Chair until March 2013, when he was fired. He personally holds 29.4% of its stock.

5.     In the seven years when Suntech's American Depositary Shares ("ADSs") traded on the New York Stock Exchange, Suntech sold $1,812,500,000 of its securities to U.S. capital markets.

6.     In fall of 2006, Shi created two holding companies: Asia Silicon Co. Ltd. ("Asia Silicon (BVI)") a company incorporated under the laws of the British Virgin Islands Company, and Glory Silicon Technology Investments (Hong Kong) Co., Ltd. ("Glory Silicon (BVI)")[3], also incorporated under the laws of the British Virgin Islands.

7.     Shi and his wife were the sole directors of both companies. Asia Silicon (BVI)'s business address was the office of one of Shi's personal trusts.

8.     Through subsidiaries, Asia Silicon (BVI) and Glory Silicon (BVI) contracted to sell billions of dollars' worth of supplies to Suntech, always on terms disadvantageous to Suntech

---

[1] Reference to "Suntech" is to Suntech Power Holdings Co., Ltd., and all its subsidiaries but not its affiliated companies. Reference to "Suntech Holdings" is to "Suntech Power Holdings Co., Ltd.", a Cayman Islands corporation, excluding all subsidiaries.
[2] All dollar amounts in U.S. dollars.
[3] Glory Silicon Technology Investments (Hong Kong) Co., Ltd., is, despite its name, a British Virgin Islands company.

1

-- i.e., Suntech paid above the market rate for their supplies. The subsidiaries are Asia Silicon (Qinghai) Co. Ltd. ("Asia Silicon (Qinghai)"), and Glory Silicon Energy (Zhenjiang) Co. Ltd. ("Glory Silicon (Zhenjiang)").

9.     Shi made Suntech purchase 18% of Glory Silicon (Zhenjiang) in May 2008 for $21.4 million. Shi then made Suntech purchase Glory Silicon (Zhenjiang)'s successors for $203.4 million in the fall of 2010. Shi did not disclose to investors that he owned Glory Silicon (Zhenjiang) and its successors. At the time of the fall 2010 acquisition, analysts remarked that Suntech was effectively paying double the going rate for the successors' manufacturing capacity. Shi responded that Suntech overpaid for them because it urgently needed their manufacturing capacity. This explanation, whatever its merits, trades on the public's ignorance that Shi actually owned and controlled Glory Silicon (Zhenjiang) and its successors; otherwise, they would realize that because he owned and controlled them, he could make them supply products to Suntech as needed.

10.    Shi awarded more than $1.5 billion in contracts to Asia Silicon (Qinghai), mere months after Asia Silicon (Qinghai)'s establishment, and more than a year before Asia Silicon (Qinghai) would produce any supplies. The contract was a take-or-pay contract; Suntech had to either take the supplies from Asia Silicon (Qinghai) or pay it consideration, until the termination of the contract in 2015.[4] The contracts were on terms advantageous to Asia Silicon (Qinghai). For example, in the first quarter of 2012, Suntech paid about 15% more than the market rate for Asia Silicon (Qinghai)'s polysilicon. Suntech also prepaid Asia Silicon (Qinghai) tens of millions of dollars for its supplies. In December 2011, even as Suntech desperately warned its investors that there was doubt that Suntech could continue as a going concern because it didn't have enough

---

[4] Suntech's announcements are ambiguous concerning some details about the Asia Silicon (Qinghai) contracts. Some report that the definitive contract between the two was signed in January 2007 -- that is, a month after Asia Silicon (Qinghai) was established. See 2010 20-F, at 95. Other claim that the contract was entered into in or around October 2007. See Suntech, Press Release, Suntech Announces $1.5 Billion Seven-Year Polysilicon Purchase Contract With Asia Silicon, October 25, 2007, available at http://www.prnewswire.com/news-releases/suntech-announces-15-billion-seven-year-polysilicon-purchase-contract-with-asia-silicon-58911797.html <.> Some claim that the contract called for performance for seven years, or until 2015/16 (since the contract provided that performance would begin in 2008, and it actually began in 2009). *See id.* Other claim that the supplies would be sold over sixteen years, or until 2024/25. *See* 2010 20-F, at 95.

2

cash, it prepaid $61.3 million to Asia Silicon (Qinghai). Nor was Suntech required to make prepayments by high demand for Asia Silicon (Qinghai)'s supplies: Suntech was its only customer.

11. On May 4, 2011, Shi told Suntech that he had bought 91.3% of Asia Silicon (Qinghai)'s shares. The Board represented that they (a) reviewed the purportedly proposed transaction to determine whether Shi had taken a company opportunity, and (b) would review transactions with Asia Silicon (Qinghai) to ensure that they met with the Audit Committee's guidelines on related party transaction.

12. Yet Suntech continued to buy supplies from Asia Silicon (Qinghai) for more than the market rate, and continued to prepay for those supplies even as its own working capital became increasingly scarce.

13. In early 2012, as Suntech's position continued to become more precarious, Suntech lent $100 million to a private company called Shanghai Sunland-Shangli Investment Co., Ltd. ("SSS") SSS is a mysterious private equity firm with no direct relation to Suntech; it does not buy Suntech's products or make products Suntech buys. But its legal representative is Zhengrong Shi's wife, its managing director is an old friend of Shi's who is also Shi's personal money manager, and according to a company it acquired, Shi is a managing partner.

14. Though Suntech's downfall was inevitable since it continued to siphon its cash to Shi's other companies, Suntech has claimed that the event precipitating Wuxi Suntech's bankruptcy was its claimed discovery that Suntech had been defrauded. The company that Suntech claimed defrauded it was an exotic company that had been established pursuant to a development plan Suntech created based aounnd Global Solar Fund S.C.A., Sicar ("GSF"). Suntech had guaranteed the debts of a company GSF invested in; in return, GSF's managing partnership had pledged €560 million of German government bonds (the "GSF Pledge"). When, in August 2012, Suntech sought to monetize the bonds to provide the working capital it needed, it discovered that the GSF Pledge "may not have existed." It was not able to monetize it -- it did not exist -- and Suntech's subsidiary collapsed because it was unable to pay its debts.

15. But that, too, was a related party transaction: Shi owned 10.67% of GSF.

16.     Left by Shi's looting with too few funds to meet its obligations, on March 21, 2013, Wuxi Suntech -- Suntech Holdings' main operating subsidiary -- was placed into bankruptcy by a consortium of eight Chinese banks.

## II.     PARTIES

### A.     PLAINTIFF.

17.     Plaintiff currently owns shares of Suntech common stock and has continuously owned such shares at all relevant times. Plaintiff will adequately and fairly represent the interests of Suntech in enforcing and prosecuting its rights.

18.     Plaintiff brings this action derivatively in the right and for the benefit of Suntech to redress injuries suffered, and to be suffered, by Suntech as a direct result of the defendants' breaches of fiduciary duties set forth herein. Suntech is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

19.     Nominal defendant Suntech Power Holdings Co., Ltd., is a Cayman Islands corporation whose principal executive offices are located at 9 Xinhua Road, New District, Wuxi, Jiangsu Province 214028, People's Republic of China. Suntech's IPO took place in December 2005, and since then, its ADSs have been traded on the NYSE under the ticker STP. Suntech operates through subsidiaries located throughout the world. Suntech's headquarters in the Americas is 71 Stevenson Street, 10th Floor, San Francisco, CA 94105.

### B.     DEFENDANTS.

20.     Defendant Zhengrong Shi was Suntech's founder, and was Suntech's CEO and Chair of its Board since its founding in 2001. On August 15, 2012, Shi stepped down as Suntech's CEO; on March 4, 2013, Suntech announced that Shi had resigned as the Chair of its Board of Directors. He remains a director. Shi is a citizen of a foreign state.

21.     Suntech has made Shi rich. In 2008, his wealth -- largely derived from Suntech and ownership of Suntech suppliers -- was estimated to be $2.9 billion.

22.     Defendant David King was appointed as Suntech's Chief Financial Officer in April 2011, and remained in this position until August 15, 2012, when he was appointed as Suntech's

4

CEO. King has also been a director of Suntech from May 2011 to the present. King is a citizen or subject of a foreign state.

23.    Defendant Julian Ralph Worley is a director of Suntech, the chair of its audit committee, and a member of its compensation committee. He has held these positions since October 2010. Worley is a citizen or subject of a foreign state.

24.    Defendant Susan Wang ("S. Wang") has been a director of Suntech and a member of its audit committee since April 10, 2009. Since March 4, 2013, she has also been the Chair of its Board. Wang is a citizen of California and resides in this District.

25.    Amy Yi Zhang was Suntech's CFO between August 2005 and May 2011, and was also a director between February 2007 and April 2011. Zhang is a citizen or subject of a foreign state.

26.    Defendant Zhi Zhong Qiu has been a director, and a member of Suntech's compensation, and corporate and governance and nominating committees, since before Suntech's Initial Public Offering ("IPO"), and remains in these positions to this day. Qiu is a citizen or subject of a foreign state.

27.    All defendants collectively are the "Defendants".

**C.    AUDIT COMMITTEE.**

28.    Suntech's Audit Committee's duties include review of "any unusual or non-recurring transaction":

> **Annual Financials.** Review and discuss with management and the independent auditors the Company's annual audited financial statements, (including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations"), any unusual or non-recurring items, the nature and substance of significant reserves, the adequacy of internal controls and other matters that the Committee deems material, prior to the public release of such information. Obtain from the independent auditors assurance that the audit was conducted in a manner consistent with Section 10A of the Exchange Act. Recommend to the Board whether the annual audited financial statements should be included in the Company's Annual Report on Form 20-F.

29.    The Charter also provides that the Audit Committee must review "all" proposed related-party transactions, and references an an Annex D:

**Related Party Transactions**. Conduct an appropriate review of ***all*** proposed related-party transactions (which term refers to transactions that would be required to be disclosed pursuant to Item 7B of Form 20-F as described in <u>Annex D</u> hereto), including proposed amendments to existing related party transactions. Management shall not cause the Company to enter into any new related party transaction unless such transaction is approved by the Committee or relates to transactions previously adopted by the Board and approved by the Committee.

[Second emphasis added].

30.     And Annex D, in turn, provides:

Related Party Transactions mean transactions or loans between the company and (a) enterprises that directly or indirectly through one or more intermediaries, control or are controlled by, or are under common control with, the company; (b) associates; (c) individuals owning, directly or indirectly, an interest in the voting power of the company that gives them significant influence over the company, and close members of any such individual's family; (d) key management personnel, that is, those persons having authority and responsibility for planning, directing and controlling the activities of the company, including directors and senior management of companies and close members of such individuals' families; and (e) enterprises in which a substantial interest in the voting power is owned, directly or indirectly, by any person described in (c) or (d) or over which such a person is able to exercise significant influence. This includes enterprises owned by directors or major shareholders of the company and enterprises that have a member of key management in common with the company. Close members of an individual's family are those that may be expected to influence, or be influenced by, that person in their dealings with the company. An associate is an unconsolidated enterprise in which the company has a significant influence or which has significant influence over the company. Significant influence over an enterprise is the power to participate in the financial and operating policy decisions of the enterprise but is less than control over those policies. Shareholders beneficially owning a 10% interest in the voting power of the company are presumed to have a significant influence on the company.

(1)     The nature and extent of any transactions or presently proposed transactions which are material to the company or the related party, or any transactions that are unusual in their nature or conditions, involving goods, services, or tangible or intangible assets, to which the company or any of its parent or subsidiaries was a party.

(2)The amount of outstanding loans (including guarantees of any kind) made by the company, its parent or any of its subsidiaries to or for the benefit of any of the persons listed above. The information given should include the largest amount outstanding during the period covered, the amount outstanding as of the latest practicable date, the nature of the loan and the transaction in which it was incurred, and the interest rate on the loan.

31.     Since at least May 9, 2011, the Audit Committee has consisted of Defendants Worley and Wang, with Worley as chair.

6

D.     **IMPORTANT NON-PARTIES.**

32.     Wei Zhang ("W. Zhang") is Shi's wife. W. Zhang and Shi were the sole two directors of Asia Silicon and Glory Silicon when the companies were incorporated in late 2006.

33.     Asia Silicon (BVI) was incorporated by W. Zhang and Shi under the laws of the British Virgin Islands on December 21, 2006.

34.     Glory Silicon (BVI) was incorporated by W. Zhang and Shi on September 7, 2006 under the laws of the British Virgin Islands.

35.     Shi admits that he owns and controls many investment vehicles, including:

- D & M Technologies Ltd., a company incorporated under the laws of the British Virgin Islands. It is owned and controlled in whole by Zhengrong Shi's family trust. Zhengrong Shi is its sole director. D & M's offices in China are at Suntech's headquarters; it also has offices in Hong Kong.

- Power Surge Limited, a company incorporated under the laws of the Bahamas;

- Power Surge Trust, incorporated under the laws of Singapore;

- Best (Regent) Asia Group, Ltd.

36.     SSS is a China-based private equity firm. Shi's wife, W. Zhang, is its legal representative. Shi's longtime financial planner and friend Qiuming Chen is its managing director.

37.     Qiuming Chen is the managing director of SSS and Power Surge, a trust owned by Zhengrong Shi. He is Shi's personal friend and financial manager. They met while Shi was conducting research in Australia, prior to moving to China in 2001.

### III.     JURISDICTION AND VENUE.

38.     Jurisdiction is based on diversity of citizenship. Plaintiff is a citizen of Oregon. S. Wang is a citizen of California. Shi, King, Worley, Zhang, and Qiu are citizens or subjects of foreign states. No plaintiff is of the same state as any defendant, and hence this is a suit between "citizens of different States and in which citizens or subjects of a foreign state are additional parties." 28 U.S.C. § 1332(a)(3). The amount in controversy exceeds $75,000.

39.     Venue is proper in this district because S. Wang resides in this district and all other defendants are not residents in the United States and may be sued in any judicial district, and their

joiner is disregarded in determining where the action may be brought with respect to other defendants. 28 U.S.C. § 1391(b)(1), (c)(3).

## IV.  DEFENDANTS' MISCONDUCT[5]

### A.  SUNTECH IS FOUNDED, LISTS ON THE NEW YORK STOCK EXCHANGE, OBTAINS ALMOST $2 BILLION FROM U.S. CAPITAL MARKETS, AND COLLAPSES.

40.     Zhengrong Shi was born in 1963 in a small Chinese town called Youfang. In 1988, he moved to Australia to attend the University of New South Wales in Australia to complete his PhD, which he obtained in 1990. He also became an Australian citizen

41.     In September 2001, Shi returned to China from Australia to found Suntech.

42.     In May 2002, Suntech began operations.

43.     Suntech Holding is a company incorporated under the laws of the Cayman Islands. It operates through subsidiaries.  The largest is Wuxi Suntech, in China.

44.     Suntech manufactures and sells photovoltaic ("PV") cells and modules in China, some European countries, and the United States. It sells residential, commercial, agricultural, and utility-scale solar panels.

45.     By 2004, Suntech had grown to be one of the world's top 10 manufacturers of PV cells, based on production output.

46.     Fresh from this success, in 2005, Suntech set out to conduct its Initial Public Offering ("IPO"). Its IPO, conducted in December 2005, raised about $320 million from selling

---

[5] Plaintiffs' allegations are drawn from: (1) primary sources; (2) Suntech's SEC filings and other documents available on the internet; (3) Chinese-language press, including: (a) an article entitled "Who is Hollowing out Suntech", by Dan Xie, published in the Southern Weekly on October 13, 2012, a newspaper that has the largest circulation of any weekly in China, and was hailed by the New York Times as "by far the largest and most influential Chinese paper that consistently produces top-flight investigative journalism." Elisabeth Rosenthal, March 24, 2002, Under Pressure, Chinese Newspaper Pulls Exposé on a Charity, March 24, 2002, available at http://www.nytimes.com/2002/03/24/world/under-pressure-chinese-newspaper-pulls-expose-on-a-charity.html; (b) an article entitled "Life and Death of Suntech Power," by Wang Fangjie, published in Capital Week on November 12, 2012; (c) an article entitled Zhengrong Shi's Stepping Down Exposes Transfer of Benefits: Wuxi Government Takes Over Suntech, published in Global Entrepreneur Magazine, on January 22, 2013; (d) an article entitled "Whose Suntech: Nonstop Internal Fighting; $570,000,000 Debts due in March", by Zhuoying Jiang and Min Min, published on January 15, 2013 by 21st Century Business Herald; and an article entitled "Suntech's BOD Has Started Auditing Shi's Related Party Transactions and Hidden Wealth", published by solarzoom.com, an industry website.

ADSs  to U.S. capital markets, each representing one share. That year, it also raised $80,000,000 from selling preferred shares to U.S. capital markets.

47.     In addition to its IPO, Suntech has raised over $1.4125 billion from selling securities to U.S. capital markets:

(a)     $500 million in 2007 (from selling convertible notes);

(b)     $575 million in 2008 (from convertible notes);

(c)     $337.5 million in 2009 (from convertible notes and ADSs);

48.     Zhengrong Shi arranged to have much of the wealth Suntech raised transferred out to other companies Shi owned and controlled. Shi caused Suntech to pay above-market rates, extend no-interest loans, and make commercially unreasonable prepayments, to suppliers. He also arranged to have employees on Suntech's payroll work for his other companies.

49.     In December 2006, Suntech became the third largest solar panel manufacturer in the world, measured by manufacturing capacity. It operated manufacturing facilities throughout the world, including one in Goodyear, Arizona.

50.     Suntech's fortunes began to decline in 2008.

51.     Beginning in late 2011, Suntech had reached a crisis. In 2011, it incurred a net loss of about $1.018 billion on revenues of about $3.914 billion. Suntech variously blamed a glut in the solar industry, duties imposed by the U.S., and the global credit crisis.

52.     By then, Suntech also had a substantial working capital deficit, and its 2011 annual report on Form 20-F admitted:[6]

> ***We are operating with a significant working capital deficit; if we do not successfully execute our liquidity plan, we face the risk of not being able to continue as a going concern.***
> As of December 31, 2011, we had a working capital deficit (being our total consolidated current liabilities less our total consolidated current assets) of $522.9 million.[7] [...].
>
> We are in need of additional funding to sustain our business as a going concern, and we have formulated a plan to address our liquidity problem. Our liquidity plan includes:
> - obtaining additional bank financing;

---

[6] A 20-F is an annual report that is similar to a 10-K. Certain foreign companies that report to the SEC must use a Form 20-F.
[7] 2011 Form 20-F at 9.

- using available credit facilities to roll-forward short-term borrowings;
- obtaining funding from the issuance of additional equity or debt, subject to market conditions; and
- reorganization of our business and monetizing our non-core assets.

We cannot assure you that we will successfully execute our liquidity plan. If we do not successfully execute this plan, we may not be able to continue as a going concern. The failure of any of the liquidity plan events could materially and adversely affect our financial condition, results of operations and business prospects.

53.     In 2012, Suntech continued to lose money. As it reported in a press release issued on May 24, its net loss for the first quarter was $132.9 million.

54.     Suntech had previously expanded its operations to invest directly in large-scale solar power plant development in Europe. To do so, Suntech created an entity called GSF under Luxembourg law, and GSF in turn created and held companies that themselves constructed the large-scale power projects (the "GSF Investees"). So Suntech had a significant ownership in the GSF Investees and the plants themselves.

55.     For accounting reasons, however, Suntech carried its investment in GSF as an equity investment into GSF. Suntech held 79% of GSF; Shi owned 10.67% personally. The remainder was owned by GSF's day-to-day manager, GSF Capital Pte Ltd. ("GSF Capital") managed GSF's day-to-day operations (which was itself owned by a holding company).

56.     In May 2010, Suntech had guaranteed the payment obligations of one the GSF Investees. In return, GSF Capital pledged €560 million in German government bonds to Suntech (the "GSF Pledge").

57.     In 2012, as its financial situation became increasing precarious, Suntech searched for assets to monetize. It found the GSF Pledge, and sought to use it.

58.     When Suntech sought to use the GSF Pledge, *it determined that the bonds underlying the GSF Pledge "may not have existed"*.

59.     In the fourth quarter of 2012, $847 million of Suntech's debt was scheduled to come due. In the first quarter of 2013, $739 million of Suntech's debt was scheduled to come due.

60.     Unable to rely on the GSF Pledge for cash flows, Suntech was unable to service its debt as obligations under it came due. It sought forbearance from bondholders on its debt obligations.

61.     On March 20, 2013, Wuxi Suntech was placed into bankruptcy by eight Chinese banks.

62.     On May 1, 2013, Suntech announced its financial results for fiscal year 2012. Suntech's revenues were $1.625 billion, a year-over-year decline of about 48%. Its gross margin was about negative 1.4%.

63.     As this complaint is filed, Suntech Holdings has not declared bankruptcy.

**B.      SUNTECH COLLAPSED BECAUSE SHI HAD HOLLOWED IT OUT.**

      **1.      Shi and his wife found Asia Silicon.**



64.     In late 2006, Shi incorporated two British Virgin Islands companies:  Asia Silicon (BVI) (December 13, 2006), and Glory Silicon (BVI) (September 7, 2006).

65.      Asia Silicon (BVI) and Glory Silicon (BVI) are holding companies. They are related parties to Suntech because they are controlled and owned by Shi and his wife. Asia Silicon (BVI) ultimately owned Asia Silicon (Qinghai), its operating subsidiary, and Glory Silicon (BVI) ultimately owned Glory Silicon (Zhejiang), its operating subsidiary.

66.     Asia Silicon (BVI)'s registered agent and office was SHRM Trustees (BVI) Limited, Trinity Chamber, P.O. Box 4301, Road Town, Tortola VG1110, British Virgin Islands.

Glory Silicon's registered agent and office was Offshore Incorporations Limited, Offshore Incorporations Centre, P.O. Box 957, Road Town, Tortola, VG1110.

67.     Asia Silicon (BVI)'s correspondence address was 21st Floor, Edinburgh Tower, 15 Queen's Road Central, Hong Kong. Glory Silicon (BVI)'s corresponding address was 21st Floor, Edinburgh Tower, 15 Queen's Road Central, Hong Kong.

68.     The principal Hong Kong place of business for D & M Technologies, Shi's family company, is 21st Floor, Edinburgh Tower, The Landmark, 15 Queen's Road Central, Hong Kong - the same business address as Asia Silicon (BVI) and Glory Silicon (BVI).

69.     At inception, Zhengrong Shi and his wife Wei Zhang were the only two directors of Asia Silicon (BVI) and Glory Silicon (BVI).

70.     On December 30, 2006, Shi caused Asia Silicon (BVI) to incorporate Asia Silicon (Qinghai). Asia Silicon (BVI) invested $47.5 million in Asia Silicon (Qinghai), and ultimately owns 95%[8] of it. Asia Silicon (Qinghai) is controlled by Shi and his wife.

71.     By March 15, 2007, Asia Silicon (Qinghai)'s general manager was Tihu Wang, who was also a director. Wang met Shi when Shi was completing his PhD in Australia. Wang and Shi hold a patent together,[9] which they applied for on February 8, 2007. Wang returned to China to found Asia Silicon (Qinghai) with Shi. In 2006-2007, according to an internal telephone directory, Wang was a vice president of Suntech.

72.     By March 15, 2007, Asia Silicon (Qinghai) had four other directors, for a total of five: Weiguo Zhang (chair), Yuxin Zhang, Hui Liao, and Zimin Zhang.

73.     Of the four additional directors at least two were related to Zhengrong Shi:[10]

(a)     Weiguo Zhang was an executive director and a vice general manager of Suntech. Weiguo Zhang approached Shi in 2000, after Shi gave a speech to an audience that included Weiguo Zhang. Since then, Shi has been Weiguo Zhang's

---

[8] The remainder was owned by Qinghai New Energy Research Institute Co. Ltd., which is a research institute owned by the state of Qinghai. Qinghai invested $2.5 million for its 5% stake.
[9] Shi and Tihu hold Australian patent 2007348634, which is U.S. Patent PCT/CN2007/000445. Tihu and Shi applied for the patent on February 8, 2007.
[10] A third director -- Zhimin Zhang -- was a representative of the Qinghai Government, which held 5% of Asia Silicon's stock.

professional mentor and personal friend. Shi employs Weiguo Zhang to conduct

professional odd jobs, including obtaining investments for Shi's companies. With

33.3 million shares, he was Suntech's fifth largest investor before the IPO;

(b)     Yuxin Zhang had recently been a financial advisor during Suntech's IPO in

December 2005, is also a personal friend of Shi's, and is a relative of Shi's wife

Wei Zhang.

74.    Thus, Shi's associates held a majority of seats on Asia Silicon's board.



(1) Weiguo Zhang: Executive director and general manager of Suntech. Has known Shi since 2000. Is employed directly by Shi to perform various professional tasks.
(2) Yuxin Zhang: Was a financial advisor during Suntech's IPO in 2005. Is also a personal friend of Shi's and a relative of Shi's wife Wei Zhang.
(3) Tihu Wang: Met Shi when he was completing his PhD in Australia. Holds a patent with Shi. Was a Suntech vice-president in 2006-2007.
(4) Quiming Chen: Is Shi's personal money manager. Is managing director or investment manager of at least Shi's companies Power Surge and SSS. Is also a director of Glory Silicon (Zhenjiang).
(5) Zhimin Zhang: Representative of Qinghai government

**2.     Shi and his wife found Glory Silicon.**



75.     Glory Silicon (BVI), controlled by Shi and his wife, ultimately owns Glory Silicon (Zhenjiang).[11]

76.     Glory Silicon (Zhenjiang) was established in the small town in which Zhengrong was born: Youfang town.

77.     At its founding, it had three directors: Meirong Wu, Yicheng Wang, and Zhongying Li. Wu and Li were born Younfang, the same small town in which Zhengrong was born. All three were Shi's personal friends. Wu was the director of Glory Silicon (BVI)'s subsidiary, Glory Silicon (Hong Kong); Li became the director of Hong Kong Rising Prosperity Co., Ltd. ("RenDe (Hong Kong)") an intermediate[12] holding company that was founded to replace Glory Silicon (Hong Kong) in owning Glory Silicon (Zhenjiang) (see ¶119-128, below).

78.     Shi controlled Wu and Li.

79.     All of the various Asia Silicon and Glory Silicon entities are private (i.e., not publicly-owned) companies.

---

[11] Glory Silicon (BVI) owns 100% of Glory Silicon (Hong Kong), and that company wholly owns Glory Silicon (Qinghai).
[12] That is, RenDe (Hong Kong) was itself owned by Glory Silicon (BVI), which was owned by Shi and his wife.

80.     Through several levels of holding companies and registered straw owners, Shi ultimately owned 100% of Glory Silicon (Zhenjiang) and 95% of Asia Silicon (Qinghai).



(1) Meirong Wu: Personal friend of Shi's. Director of Glory Silicon (Hong Kong). Born in the same small town as Shi, Youfang.
(2) Zhongying Li: Personal friend of Shi's. Director of Hong Kong Rising. Born in the same small town as Shi, Youfang.
(3) Defendant Amy Yi Zhang: Suntech's then-CFO.
(4) Quiming Chen: Is Shi's personal money manager. Is managing director or investment manager of at least Shi's companies Power Surge and SSS. Is also a director of Glory Silicon (Zhenjiang).

**3. Shi loots Suntech through Asia Silicon.**



81.     Asia Silicon (Qinghai) manufactures polysilicon that is used in photovoltaic cells and modules that Suntech manufactures.

82.     Suntech did not disclose that Asia Silicon (Qinghai) was a related party when Asia Silicon (Qinghai) was founded.

83.     On October 25, 2007, Suntech announced that it had entered into a definitive seven year[13] contract to purchase $1.5 billion of polysilicon from Asia Silicon (Qinghai).[14] It is not clear when Suntech actually entered into this definitive contract. The October 25 press release implies that Suntech had only just entered into the contract, but later filings claimed that the contract was entered into in January 2007 -- that is, less than a month after Asia Silicon (Qinghai) was incorporated on December 30, 2006, and perhaps a month after Asia Silicon (BVI) was incorporated on December 20, 2006.[15]

---

[13] It is not clear whether the initial performance period was seven or fifteen years. See note 4, above.

[14] Though the initial press release stated that the contract was for seven years, Suntech later stated that it was for fifteen years.

[15] See note 4, above.

84.     The contract included a take-or-pay provision, meaning that Suntech was required to buy Asia Silicon (Qinghai's) supplies, up to a certain minimum amount, even if Suntech determined it didn't need or want Asia Silicon (Qinghai)'s polysilicon. Take-or-pay provisions are very favorable to sellers, guaranteeing a stream of income.

85.     At the time, Asia Silicon had yet to produce any polysilicon, or even anything at all. Its production facility was under construction. It would only begin producing polysilicon in July 2008. Its registered capital was $50 million -- the $47.5 million Shi had put in, and the $2.5 million the Qinghai government had put in; but the plant reportedly cost $99.8 million to build.

86.     The October 25 press release announcing the deal touted Asia Silicon (Qinghai)'s CEO, Tihu Wang -- representing that he was "one of the world's leading polysilicon material scientists [and had] built a formidable team of talented scientists, engineers and operations professionals". It did not mention Wang's personal and professional connections with Shi. Nor did it mention that Shi controlled and partly owned Asia Silicon (Qinghai). It did not discuss any of Shi's substantial ties to Asia Silicon (Qinghai). It did not disclose that Asia Silicon (Qinghai) was a related party.

87.     Suntech was Asia Silicon (Qinghai)'s only customer.

88.     Asia Silicon (Qinghai) began production in July 2008, and began delivery in the first half of 2009.

89.     Suntech also helped Asia Silicon (Qinghai) out at Suntech's own expense in other ways.

90.     In 2008, Suntech made a $10 million interest-free loan to Asia Silicon (Qinghai) Suntech also helped Asia Silicon (Qinghai) obtain a RMB 500 million loan from Standard Chartered Bank, by guaranteeing the entire loan.

91.     Suntech prepaid for delivery of Asia Silicon (Qinghai)'s supplies. Suntech prepaid $48.6 million in 2008 (before Asia Silicon (Qinghai) ever shipped it supplies), and $100 million in 2009. On December 31, 2010, Suntech's prepayment balance with Asia Silicon (Qinghai) was $82.4 million.

92.   Asia Silicon (Qinghai) never needed any short-term bank loan. As of October 2012, the balance on Asia Silicon (Qinghai)'s bank loans used to fund its development is only RMB 622 million ($99 million).[16]

93.   But as of December 31, 2011, *Suntech* owed $1.573 billion in short term loans -- about 79% of its assets. In its 2011 annual report, Suntech advised shareholders that there were doubts about its ability to continue as a going concern because of its working capital deficit.

94.   Yet Suntech continued to make advance payments to Asia Silicon (Qinghai). On December 31 2011, Suntech had a balance of $69.1 million in prepayments to Asia Silicon (Qinghai).

95.   Even at the beginning of 2012, when Suntech was teetering on the edge of bankruptcy, it continued to make substantial prepayments to Asia Silicon (Qinghai).

96.   Suntech pays Asia Silicon (Qinghai) more than market rates. In the first quarter of 2012, Suntech's purchased Asia Silicon's polysilicon for about $30 per kilogram, or about 15% more than the rate charged by GLC-Poly, China's largest polysilicon manufacturer.

97.   Asia Silicon (Qinghai)'s profit margin was 41.8%, significantly higher than larger suppliers whose profit margins were at most about 33%. Most of those suppliers had far more experience than Asia Silicon (Qinghai) in making polysilicon.

98.   As Suntech's board of directors learned in May 2011, employees on Suntech's payroll were tasked with working for Asia Silicon (Qinghai). For example, Suntech financial staff helped Asia Silicon obtain financing, by participating in road shows and interceding with banks.

99.   On February 17, 2009, Suntech acquired a 12.5% stake in Asia Silicon (Qinghai) from a person identified only as "an existing shareholder." Suntech paid $8.1 million. That day, Asia Silicon (Qinghai) changed the composition of its board of directors. Shi was its chair; its other board members were:

(a)   Qiuming Chen, who is the investment manager of many trusts established to manage Shi's finances;

---

[16] Exchange rate 6.237.

(b)   Zhimin Zhang, the representative of the Qinghai government, who remained as board member;

(c)   Tihu Wang, who remained as a board member; and

(d)   Weiguo Zhang, who resigned the chair and became one of Asia Silicon (Qinghai)'s directors.

100.   Thus, the Board's composition changed to: Zhengrong Shi (chair); and Qiuming Chen (director -- controlled by Shi), Tihu Wang (director -- controlled by Shi), Weiguo Zhang (director -- controlled by Shi), and Zhimin Zhang (a representative of the Qinghai Government).[17]

101.   During 2009, Suntech bought 7.5% more of Asia Silicon (Qinghai)'s stock, of which 5 percentage points was the acquisition of the Qinghai government's stake.

102.   Suntech sold its stake in Asia Silicon (Qinghai) on December 1, 2010. Suntech told investors that between February 17, 2009, and December 1, 2010, Asia Silicon (Qinghai) was a related party because Suntech itself owned many of its ADSs. Suntech did not disclose that Asia Silicon (Qinghai) was a related party from its inception.

103.   On December 1, 2010, when Suntech disposed of its stake in Asia Silicon (Qinghai), Weiguo  Zhang and Zhimin Zhang were removed as directors. But even after Suntech had divested itself of its stake in Asia Silicon (Qinghai), Shi remained as Asia Silicon (Qinghai)'s board's chair, as did his personal money manager Qiuming Chen.

104.   On May 4, 2011, Shi informed Suntech that a firm owned by his family trust, D & M Technologies Limited, had contracted to buy 91.3% of Asia Silicon (Qinghai)'s stock. Suntech did not disclose the amount D & M paid. D & M actually purchased 91.3% of Asia Silicon (Qinghai)'s shares.

105.   After the contract providing for D & M's acquisition of Asia Silicon (Qinghai) was disclosed to Suntech, but before the transaction closed, Suntech's Board assessed the transaction. On May 9, 2011, the Board represented that it had made a determination that no corporate opportunity of Suntech's was lost or stolen by the acquisition.

---

[17] On May 18, 2009, Asia Silicon bought out the Qinghai Province Institute of New Energy Co., Ltd., and Zhimin Zhang resigned as director.

106.    Suntech's ethical code required the Board to approve all related party transactions. The ethical code applied to Suntech's CEO, Shi. Asia Silicon (Qinghai) was one of Suntech's largest suppliers. And Suntech was not free to choose another supplier: it had signed a take-or-pay contract with Asia Silicon (Qinghai), which required it to keep buying Asia Silicon (Qinghai)'s polysilicon until at least 2015,[18] in quantities of up to $1.5 billion.

107.    Suntech's Board never clarified whether it was informed of the purported acquisition before it closed.

108.    Suntech also represented to investors that transactions with Asia Silicon would have to meet the approval procedures Suntech's audit committee had imposed.

109.    On May 9, 2011, when it made the representations described in ¶¶103-108, Suntech's Board consisted of Julian Ralph Worley, Susan Wang, Amy Yi Zhang, and Shi Zhengrong. As of April 27, 2012, the Board consisted of Zhi Zhong Qiu, Julian Ralph Worley, Susan Wang, David King and Shi.

### 4    Shi loots Suntech through Glory Silicon.



110.    Glory Silicon (Zhenjiang) produces wafers used in the photovoltaic cells and modules that Suntech manufactures.

111.    In 2007, Suntech made a RMB 10.8 million deposit to Glory Silicon (Zhenjiang).

---

[18] See note 4, above.

112. Suntech then entered into two definitive wafer supply contracts with Glory Silicon (Zhenjiang): a five month contract beginning September 2008, and a three year supply contract starting from August 2009. The three year supply contract was for $300 million, and had a take-or-pay provision.

113. In early 2008, Suntech entered into a $300 million take-or-pay agreement with Glory Silicon (Zhenjiang).

114. Aside from those contracts, Suntech also bought $63.7 million of raw supplies from Glory Silicon (Zhenjiang) in 2008. It also bought $101 million of Glory Silicon (Zhenjiang)'s supplies in 2009, again aside from the supply contracts.

115. Later, in May 2008, Suntech bought 18% of Glory Silicon (Zhenjiang)'s shares for $21.4 million.

116. Because it was owned by Shi, Glory Silicon (Zhenjiang) was a related party. But Shi did not disclose that Glory Silicon (Zhenjiang) had been a related party, nor that Suntech's acquisition of Glory Silicon (Zhenjiang)'s shares was a related-party transaction. Rather, Shi caused Suntech to mislead investors by stating that "Glory Silicon [(Zhenjiang)] became an affiliate in May 2008 when we acquired 18.0% of its equity interest from certain of its existing shareholders."

117. After the May 18 acquisition, Glory Silicon (Zhenjiang) changed its Board of directors. Meirong Wu remained as chair, but the other members were removed and replaced with Zhengrong Shi, Xiaoyun Qian, Defendant Yi Zhang (Suntech's CFO), and Qiuming Chen (who manages Shi Shi's family wealth).

118. In 2009, Glory Silicon (Zhenjiang) merged with a third party. The surviving company's name was Glory Huantai Silicon Technology Co., Ltd ("Huantai"). Shi owned about 65% of Glory Huantai; the remainder was owned by Suntech (18%) and Lubao Wang (17%).

119. Glory Huantai proved unstable, and on June 1, 2010, Zhengrong Shi and Lubao Wang spun off Glory Huantai's assets and liabilities relating to wafer production was held by a

new company named Zhenjiang Rietech New Energy Science Technology Co., ("Rietech (Zhenjiang)").[19]

120.    71.4% of Rietech (Zhenjiang) was owned by Rietech New Energy Investment Co. Ltd., ("Rietech (Hong Kong)") and RenDe (Hong Kong) both companies incorporated under the law of Hong Kong.

121.    In paperwork filed with the Hong Kong administration, Rietech (Hong Kong) reported that its founding member's address was Trinity Chambers, P.O. Box 4301, Road Town, Tortola, British Virgin Islands. This is not the address of Glory Silicon (BVI)'s address, the company that owned Rietech, nor that of Glory Silicon (Hong Kong), from whom Rietech inherited its assets. But it is the same address as Asia Silicon (BVI)'s agent. Rietech (Hong Kong) and Asia Silicon (BVI) are not, according to Shi, supposed to have anything in common -- they are only two of Suntech's many suppliers. That Shi founded, owned, and controlled both Rietech and Asia Silicon (BVI) explains the identical address.

122.    Rietech (Hong Kong)'s first directors were Shi, Wei Zhang (his wife), and Qiming Chen (his money manager), and Orchid Capital Investments, Ltd. -- an otherwise unknown entity for which Shi signed.

123.    Both Rietech and RenDe were owned by Glory Silicon (BVI), which was in turn wholly owned by Zhengrong Shi and his wife. Suntech disclosed that Rietech was owned by it and two other investors, though it did not list their names.

124.    On November 17, 2010, Suntech announced that it would acquire all of the remaining interests (71.4%) in Rietech (Zhenjiang). On December 31, 2010, the acquisition closed, at a purchase price of $123.4 million plus an offset of $80 million in liabilities owed to Suntech. Glory Silicon ceased to be an affiliate on December 31, 2010.

125.    Silicon wafer production capacity is often quoted at dollars per watt of installed capacity. In the Rietech (Zhenjiang) acquisition, Suntech paid about $0.79/watt, even though Suntech could add new capacity at $0.40 per watt, and other companies could do it at $0.20 per watt.

---

[19] 2012 20-F at 44.

126.   On an earnings conference call taking place on November 17, 2010, an analyst asked Shi point blank why Suntech was acquiring capacity at such a steep price:

**Satya Kumar** - Credit Suisse

> Yes. Hi. Thanks for taking my question. Dr. Shi, I think the question that a lot of investors are asking me and I have as well, is the price that you're paying for this wafer capacity that you're buying from Glory. ***You're getting a 70% stake – the remaining 70% stake, there is this debt that they already owed you. So it appears that the capacity is being purchased at $0.79 per watt. And you're saying that you can add new capacity at $0.40 and there are some companies saying they can add new capacity at $0.20. Could you help us understand why the price paid for this capacity is significantly higher than market price to add new capacity?***

> [Emphasis added].

127.   In response, Zhengrong Shi vaguely cited a need for in-house wafering capacity in the near future:

**Zhengrong Shi** - Chairman and CEO

> Look, it's strategically is very important for Suntech to have some in-house wafering capability very quickly. I think time is essence. So, at this moment, the – of course we can build our own wafers. That probably will take like ten months, if not longer. So, if we look at valuation, I think it's only talking about two times book value and a P/E of 9 of 2010 earnings. So, I think it's already a discount of the market value in the market to the peers.[20]

128.   Shi did not disclose that he owned Glory Silicon (Zhenjiang)/Rietech (Zhenjiang).

129.   In 2011, Suntech's capital expenditures were $368.8 million, which was "mainly" spent in connection with assets acquired from Rietech (Zhenjiang).

---

[20] According to a Suntech executive interviewed by the 21st Century Business Herald, Suntech paid four times the market rate for Rietech. See also "Suntech's Strategic Manufacturing Shift Should Improve Forward Earnings", available at http://seekingalpha.com/article/254122-suntech-s-strategic-manufacturing-shift-should-improve-forward-earnings (last visited June 7, 2013) ("From a purely analytical level, Suntech paid nearly double the capital required to build out Rietech's wafer capacity.").

23

**5. Shi loots Suntech through SSS.**



130.   Power Surge Limited, a trust incorporated under the laws of the Bahamas, is wholly owned and controlled by Shi.

131.   Qiuming Chen is a long-time personal friend of and financial adviser to Shi. He is also the investment manager of Power Surge Limited.

132.   Power Surge reportedly made an investment into SSS.

133.   Qiuming Chen is the Managing Director of SSS.

134.   Shi's wife Wei Zhang is SSS's legal representative.

135.   As of December 31, 2011, Suntech had a working capital deficit of $522.9 million. Thus, Suntech warned investors, it was "in need of additional funding to sustain [its] business as a going concern." Suntech represented to investors that its plan involved (among other things) a reorganization and liquidating its peripheral activities.

136.   Soon thereafter -- in early 2012 -- Suntech made a $100 million loan to SSS.

137.   SSS is an investment company; it is neither a direct supplier nor a direct customer of Suntech.

**6. Shi attempts to loot Suntech through GSF.**

a) Shi attempts to manipulate Suntech's earnings by funneling Suntech's cash through an exotic accounting company in which he holds a 10.67% interest.

138. Suntech derives most of its revenue from manufacturing solar panels and selling them to end users, including solar power plant operators and other large-scale project developers.

139. Solar power does not achieve "grid parity" -- it is more expensive to generate electricity by solar power than with conventional fossil fuels.

140. To encourage development of solar power, European countries generally provide feed-in tariffs, which permit solar power plant operators to supply power to the grid at advantageous rates.

141. These tariffs, however, only subsidize the operation of a solar power plant -- not its design, manufacturing, or its supplies, like the solar panels Suntech manufactures.

142. So developers must obtain financing for a project sufficient to take them through the construction of a solar power plant into its operation, when they can take advantage of the subsidies. In the meantime, developers must carry substantial operating losses from construction on their own balance sheet.

143. Until mid-2008, developers were able to do so through a combination of equity investments and third-party financing.

144. Then, in mid-2008, the global economic crisis both reduced demand for Suntech's products and reduced the third-party financing available to developers to construct their plants.

145. To support its new project development business line, Suntech was sold on a new entity.

146. The concept that became GSF was first pitched to Suntech in or around January or February 2007 by Javier Romero. GSF was incorporated under the laws of Luxembourg in February 2008.

147. Suntech was a natural partner for GSF. In 2009/2010, Suntech had a nearly $4 billion balance sheet. It could obtain financing, whether by selling debt or equity securities, or by obtaining bank loans, at rates that compared favorably with other potential project developers. Indeed, in 2009, it had proceeds of $287.5 million from selling its ADSs, $50 million from selling

convertible notes, a net $181.5 million from short term bank loans, and a net $112.6 million from long term bank loans. Its net proceeds from financing were $479.4 million.

148.    Thus, GSF could use Suntech's access to capital to construct projects that weren't being constructed  because other companies could not obtain funding.

149.    Why GSF was appealing to Suntech is somewhat more involved. Romero's concept was that Suntech would make a substantial investment in an entity, but would hold less than 80% of its shares, and would avoid day-to-day control over the subsidiary.

150.    Under U.S. GAAP, which governs the presentation of Suntech's financial statements, an entity must consolidate a "subsidiary's" financial statements if it owns more than 80% of the subsidiary. But if it owns less than 80%, so long as it does not exercise day-to-day control over the subsidiary and certain other conditions are met, it can treat its interest in the subsidiary as an equity investment. As Shi later admitted in an affidavit: "Suntech didn't want to have control over management of the proposed fund. If Suntech had control, it would have been obliged to consolidate the financial statements of the proposed fund with its own."

151.    Suntech owned 79% of GSF, and Shi owned another 10.67%.

152.    As to management, however, GSF was managed by Global Solar Fund Partners, S.a.r.l ("GSF Partners"). In turn, GSF Partners was owned by GSF Capital. Romero/GSF Partners was tasked with day-to-day management. Suntech and Shi's interests gave them a vote on investment and divestment decisions; but since GSF's charter provided that no investment or divestment could proceed without Romero's approval, he held a veto; Suntech and Shi's ownership gave them, jointly, 50% of the *voting* interest in GSF.

153.    To  complete the projects, GSF would create and invest in a variety of  special purpose vehicles created to construct large projects that Suntech was hired to perform, chiefly in Italy. GSF held the special purpose vehicles (the "GSF Investees").

154.    Then, GSF would fund various project development companies that were GSF's special purpose vehicles. Suntech would sell its products directly to the GSF Investees companies. Then, Suntech would book revenues from its products as soon as it sold them to the GSF Investees -- rather than when the project was complete and Suntech was receiving revenues.

155.    Thus, Suntech could treat its interest in GSF as an unconsolidated equity investment, and it could recognize revenues from selling its solar panels to GSF as soon as it sold the goods to GSF Investees.

156.    But there were two other accounting advantages for Suntech.

157.    Under U.S. GAAP, if Suntech builds a solar power plant itself for its own account, it must record revenue during the life of the project. It must also record operating losses as they are incurred.

158.    But under U.S. GAAP, because GSF's assets are investments in the GSF Investees, Suntech's accountants let it treat GSF as an Investment Company.[21]

159.    Investment Companies value their assets at their current fair-market value. "Fair-market value" is not readily discernible in GSF's case, since GSF held investments in non-public and non-trading special purpose vehicles. As a result, GSF had substantial discretion in determining what was the fair-market value of the special purpose vehicles. And since, for GSF, "revenues" are just changes in the fair-market value of its investments, it had substantial discretion in booking revenues as well.

160.    Since Suntech recognized its interest in GSF as an equity investment, it valued its own interest in GSF as a percentage of GSF's own financial position. Thus, even if Suntech could not book its interest in a special purpose vehicle at an elevated value, if GSF did, then Suntech could book its interest in GSF at the elevated value. Similarly, if GSF increased the value it assigned to its interest in the special purpose vehicles, then Suntech could book revenues from its interest in GSF.

161.    As a second benefit, Suntech need not record losses as they were incurred on the projects -- since it could account for the project as a percentage of the value GSF attributed them on its balance sheet.

162.    As in most of his deals, Shi gave himself a slightly better deal than he gave Suntech. Suntech committed €258 million, and got 79% of GSF, implying a valuation of about

---

[21] While GSF maintained its books under Luxembourg GAAP, Suntech reconciled them to U.S. GAAP for presentation in its own financial statements.

€27 million; Shi committed €32 million, and got 10.67% of GSF, implying a valuation of €300 million. The complete terms of Shi's acquisition of GSF stock have never been disclosed.

163.  Shi owns his interest in GSF through Best (Regent) Asia Group, Ltd., a company he ultimately owns.

b)  Suntech bets its balance sheet for GFS, and loses.

164.  Suntech set about putting its balance sheet at risk to benefit GSF, and thus Shi's 10.67% interest in it. In May 2010, Suntech entered into an agreement guaranteeing all of a €554.2 million loan that China Development Bank provided to the largest GSF Investee, Solar Puglia II, S.a.r.L. Suntech also deposited €30 million in cash as collateral for the Bank. As sole collateral for its guarantee, Suntech obtained from GSF Capital what Suntech represented was a pledge of €560 million in the form of German government bonds GSF Capital owned.

165.  Suntech's financial condition in 2012 was much worse than when it guaranteed the €554.2 in May 2010. Because of persistent looting by Shi through his companies, Suntech had accumulated a large operating capital deficit. Suntech had announced that because of this deficit, it might not be able to continue as a going concern. Its plan was to monetize peripheral assets. One of the assets it selected was the €560 million in German government bonds that had purportedly been pledged to Suntech.

166.  On July 26, 2012, a receiver was appointed over the assets of GSF Capital and Romero.

167.  On July 30, 2012, Suntech announced that there were "inconsistencies" in the bonds' paperwork. Suntech said it had concluded that the bonds "may never have existed." That same day, Suntech held a conference call with analysts, in which Shi admitted that Suntech was informed in 2010 that "GSF Capital ... have [sic] borrowed the bonds from a registered company in Europe." Thus, as Suntech knew, GSF Capital did not *own* the bonds it pledged. Suntech announced that it had begun actions in various jurisdictions to assert control over GSF and its assets.

28

168.    On December 7, 2012,  Suntech announced that it had "come to the conclusion that the [bonds] do not exist and that it has been the victim of a fraud by others." Suntech added that it would record a "guarantee obligation in the range of $60 million to $80 million."

169.    On March 7, 2013, Suntech announced a settlement of all its claims against GSF Capital and Romero. The settlement provided that GSF Capital would contribute its ownership interest in GSF, increasing Suntech's ownership to 88.15%, and increasing Shi's ownership to 11.85%. Suntech stated that it would pay GSF Capital an "agreed consideration". Suntech announced no other terms to the settlement.

### C. SHI COMMITTED A FRAUD ON THE MINORITY.

#### 1.   As a practical matter, Shi controls the majority of shares whose votes are likely to be cast as a result of influence or apathy.

170.    As of December 31, 2011, Shi beneficially owned 30.2% of Suntech's shares. All institutional holders combined hold 26% of Suntech's shares.

171.     As a result of influence or apathy, Shi's shares are a majority of Suntech's shares whose votes are likely to be cast. Since Shi controls 30.2% of Suntech's shares, shareholders accounting for more than 30.2% of Suntech's shares must vote in favor of Suntech's suing or otherwise proceeding against Shi. Thus, at a minimum, at least 30.2% of all shareholders, or 43.7% of all shareholder excluding Shi,  must vote against Shi at a shareholder meeting.

172.    As Suntech admits:

> Dr. Zhengrong Shi, our founder, chief executive officer and chairman of our board of directors, beneficially owned 30.2% of our outstanding share capital as of December 31, 2011. As such, Dr. Shi has substantial influence over our business, including decisions regarding mergers, consolidations and the sale of all or substantially all of our assets and other significant corporate actions. This concentration of ownership may discourage, delay or prevent a change in control of our company, which could deprive our shareholders of an opportunity to receive a premium for their shares as part of a sale of our company and might reduce the price of our ADSs. These actions may be taken even if they are opposed by our other shareholders.

173.    Suntech's shares do not trade on any exchange; rather, Suntech's American Depository Shares (ADSs) trade on the NYSE and other exchanges. ADSs are not shares; rather,

they are securities entitling the holder to obtain a share from the depositary bank, in this case the Bank of New York Mellon.

174.    Because ADS holders do not have voting rights as such, Suntech admits that: *Holders of ADSs have fewer rights than shareholders and must act through the depositary to exercise those rights.*

Holders of ADSs do not have the same rights of our shareholders and may only exercise the voting rights with respect to the underlying ordinary shares in accordance with the provisions of the deposit agreement. Under our second amended and restated articles of association, the minimum notice period required to convene a general meeting is seven days. When a general meeting is convened, you may not receive sufficient notice of a shareholders' meeting to permit you to withdraw your ordinary shares to allow you to cast your vote with respect to any specific matter. In addition, the depositary and its agents may not be able to send voting instructions to you or carry out your voting instructions in a timely manner. We will make all reasonable efforts to cause the depositary to extend voting rights to you in a timely manner, but we cannot assure you that you will receive the voting materials in time to ensure that you can instruct the depositary to vote your ADSs. Furthermore, the depositary and its agents will not be responsible for any failure to carry out any instructions to vote, for the manner in which any vote is cast or for the effect of any such vote. As a result, you may not be able to exercise your right to vote and you may lack recourse if your ADSs are not voted as you requested. In addition, in your capacity as an ADS holder, you will not be able to call a shareholder meeting.

175.    Hence, shareholders who wish to vote at Suntech's annual general meeting but hold ADSs have two options: exchange the ADSs for shares, or try to vote the ADSs.

a.    Shareholders will not exchange the ADSs for shares.

176.    ADS holders can surrender their ADSs with the Bank of New York Mellon, obtain shares, and vote the shares. Since Suntech's shares do not trade on any exchange, to resell their securities to book any potential profits, share holders must surrender their shares to obtain ADSs.

177.    The Bank of New York Mellon charges $5.00 for every hundred shares ($.05 per share) to convert ADSs to shares, and $5.00 per hundred shares to convert shares into ADSs. Thus, to vote their ADSs and resell them, shareholders must pay $.10 per share -- or about 10% of the ADSs' current market value.

b.    Suntech's management is likely to prevent shareholders' attempts to vote their ADSs.

178.    As a second option, ADS holders may attempt to communicate their instructions to Bank of New York Mellon.

179.    ADS holders' right to have the Bank of New York Mellon vote their ADSs is a function of the Deposit Agreement applicable to Suntech's ADSs. This agreement provides:

> SECTION 4.7 Voting of Deposited Securities.
>
> Upon receipt of notice of any meeting of holders of Shares or other Deposited Securities, *if requested in writing by the Company* the Depositary shall, as soon as practicable thereafter, mail to the Owners a notice, the form of which notice shall be in the discretion of the Depositary and shall contain (a) such information as is contained in such notice of meeting, and (b) a statement that the Owners as of the close of business on a specified record date will be entitled, subject to any applicable provision of the People's Republic of China and Cayman Islands law and of the Memorandum and Articles of Association of the Company, to instruct the Depositary as to the exercise of the voting rights, if any, pertaining to the amount of Shares or other Deposited Securities represented by their respective American Depositary Shares and (c) a statement as to the manner in which such instructions may be given. Upon the written request of an Owner of a Receipt on such record date, received on or before the date established by the Depositary for such purpose (the "Instruction Date"), *the Depositary shall endeavor, in so far as practicable*, to vote or cause to be voted the amount of Shares or other Deposited Securities represented by the American Depositary Shares evidenced by such Receipt in accordance with the instructions set forth in such request. *The Depositary shall not vote or attempt to exercise the right to vote that attaches to such Shares or other Deposited Securities other than in accordance with such instructions.*
>
> In order to give Owners a reasonable opportunity to instruct the Depositary as to the exercise of voting rights relating to Deposited Securities*, if the Company requests the Depositary to act under the preceding paragraph, the Company shall give the Depositary notice of any such meeting not less than 30 days prior to the meeting date.*
>
> *There can be no assurance that Owners generally or any Owner in particular will receive the notice described in the first paragraph of this Section 4.7 sufficiently prior to the Instruction Date to ensure that the Depositary will vote the Shares or Deposited Securities in accordance with the provisions of that paragraph.*

[Emphasis added].

180.    Thus, if Suntech provides notice, and if Suntech provides 30 days for the Bank of New York to contact shareholders, and if the Bank of New York succeeds in contacting shareholders, then shareholders can communicate their intention to the Bank of New York, who will then try to vote that intention.

181.    Suntech's obligations to conduct annual general meetings is provided in whole by Suntech's Second Amended and Restated Memorandum & Articles of Association (the "Articles"). They provide:

31

- That Suntech is not required to give written notice to the Bank of New York, in which case the Bank of New York will take no action, and no ADSs will be voted; and

- That Suntech must provide seven -- not thirty -- days' notice, in which case the Bank of New York has no obligation to provide notice.

182.    The Articles provide that the Directors determine the time and place of the annual general meetings. The Articles provide that the Directors act by majority vote.

183.    As this complaint is filed, Suntech has six directors:

- Zhengrong Shi;

- David King (an executive director, and Suntech's CEO, and formerly Suntech's CFO);

- Susan Wang (the chair);

- Julian Ralph Worley (an independent director);

- Philip Fan (an independent director); and

- Weiping Zhou (an executive director, and Suntech's president).

184.    Shi, King, Wang, and Worley constitute a majority of Suntech's board.

185.    Shi has committed fraud on the minority; under Cayman Islands law, it is assumed for purposes of shareholder standing that he will not permit the company to act against him.

186.    King, Wang, and Worley will not cooperate in holding an annual general meeting that would permit shareholders to determine whether Suntech should sue them, or take other actions against them for their misconduct.

187.    Indeed, King, Wang, and Worley have made few efforts to protect Suntech from Shi.

188.    On May 4, 2011, Shi told Suntech that he had inked a contract to acquire Asia Silicon (Qinghai). Prior to the agreement's close, the Board determined whether to approve the contract.

189.    At the time, King was CFO, and Wang and Worley were the two members of the audit committee. On Suntech's behalf, they consented to Shi's acquisition of Asia Silicon (Qinghai).

190. Suntech was contractually obligated to pay at least $1.5 billion from Asia Silicon (Qinghai). If Suntech did not wish to buy polysilicon from Asia Silicon (Qinghai), it still had to pay Asia Silicon (Qinghai), because it had entered into a take-or-pay contract.

191. King, Wang, and Worley's conduct was negligent and/or reckless.

192. On October 13, 2012, an article appeared in the Southern Weekly in China claiming that Shi had looted Suntech through Asia Silicon (Qinghai). The Southern Weekly has the largest circulation of any weekly in China. It was hailed by the New York Times as "by far the largest and most influential Chinese paper that consistently produces top-flight investigative journalism."[22]

193. The article explained, in great detail, that Asia Silicon (Qinghai)'s directors in 2007 -- Weiguo Zhang, Yuxin Zhang, and Tihu Wang -- were all good friends. The Southern Weekly explained that Suntech continued to make commercially unreasonable prepayments to Asia Silicon (Qinghai), and that it even sent Suntech staff to work for Asia Silicon (Qinghai). It explained that SSS was a related party.

194. On November 12, 2012, an article appeared in Capital Week claiming that Shi had looted Suntech through Asia Silicon (Qinghai). Capital Week is a leading business newspaper in China.

195. The article explained that Suntech paid about 15% more for supplies from Asia Silicon (Qinghai) than commercially reasonable rates. It provided more detail on Asia Silicon (Qinghai)'s initial board. It explained that Yuxin Zhang, a director, had been a financial advisor during Suntech's IPO, that Weiguo Zhang was a large Suntech shareholder whom Shi had met years before, and that Tihu Wang returned to China to found Asia Silicon (Qinghai) with Shi. It unearthed various subsidies Suntech had extended to Asia Silicon (Qinghai) at Suntech's expense, like a $10 million interest-free loan, and a RMB 500 million guarantee for a loan from Standard Chartered Bank.

---

[22] Elisabeth Rosenthal, March 24, 2002, Under Pressure, Chinese Newspaper Pulls Exposé on a Charity, March 24, 2002, available at http://www.nytimes.com/2002/03/24/world/under-pressure-chinese-newspaper-pulls-expose-on-a-charity.html

196.    On January 22, 2013, an article appeared in Global Entrepreneur Magazine. Global Entrepreneur is a mainstream business magazine in China.

197.    The article explained that Shi had caused Suntech to engage in related party transactions with Glory Suntech (Zhenjiang). It showed that Glory Silicon (BVI) established Glory Silicon (Zhenjiang). It reported that Glory Silicon (BVI)'s initial board was made up of Shi's personal friends. It reported that Suntech's acquisition of 71% of Rietech's equity for $203 million was a related party acquisition.

198.    The article also reported that Asia Silicon (BVI) had established Asia Silicon (Qinghai) and owned 95% of it. It pointed out the strange fact that even after Suntech disposed of its investment in Asia Silicon (Qinghai), Shi remained Asia Silicon (Qinghai)'s chair.

199.    On January 23, 2013, the 21st Century Business Herald reported that Suntech had engaged in related party transactions with Glory Silicon (Zhenjiang) as well. The article cited Asia Silicon (BVI) and Glory Silicon (BVI)'s actual British Virgin Islands founding documents to prove that they were vehicles created and controlled by Shi.

200.    The 21st Century Business Herald is a leading newspaper in China.

201.    Throughout this period, Shi remained Suntech's Chair, and no internal investigation was launched. He was only removed on March 4, 2013. And on March 12, www.solarzoom.com, an industry website, reported that an internal investigation had only been instituted on March 8, 2013 -- almost two years after it should have been instituted, on May 4, 2011.

202.    Shi is still a director.

        c.    Shi has taken advantage of his position to commit the company to transactions that benefited him at the expense of Suntech.

203.    Shi caused Suntech to transfer its resources to Asia Silicon (Qinghai) and Glory Silicon (Zhenjiang) to benefit himself as owner of Asia Silicon (Qinghai) and Glory Silicon (Zhenjiang). Shi then bought 91.3% of Asia Silicon's shares, and had Suntech buy 100% of Glory Silicon (Zhenjiang)'s shares from him.

204. Suntech's purchases from Asia Silicon (Qinghai) and Glory Silicon (Zhenjiang) were made pursuant to commercially unreasonable terms, and favored Asia Silicon (Qinghai) and Glory Silicon (Zhenjiang) at the expense of Suntech.

205. The propriety of Suntech's relationship with Asia Silicon (Qinghai), was brought to all Suntech's directors' and officers' attention on May 4, 2011 at the latest. Then, Suntech's Board was required to determine whether Shi had usurped a corporate opportunity by purportedly buying 91.3% of Asia Silicon (Qinghai)'s shares. Suntech's Board negligently and/or recklessly concluded that Shi had not usurped a corporate opportunity. Then, the Board was required to determine whether Suntech's dealings with Asia Silicon (Qinghai) met with those procedures the audit committee deemed appropriate. But the Board negligently and/or recklessly continued to allow Shi to make commercially unreasonable prepayments to Asia Silicon (Qinghai) of tens of millions of dollars, even as Suntech's excessive operating capital deficit called into doubt its ability to continue as a going concern.

206. Suntech Holdings has not been dissolved and has not entered litigation against Shi or any other of the Defendants.

207. Thus, Plaintiff has standing to pursue redress for Suntech's harms.

## <u>COUNT I</u>
## <u>CLAIM FOR BREACH OF FIDUCIARY DUTY AND EQUITABLE FRAUD</u>
### (Against All Defendants)

208. Plaintiff incorporates by reference all paragraphs set forth above.

209. The defendants owed to Suntech and its shareholders the duty to exercise due care, loyalty, candor and diligence in the management and administration of Suntech and to act in good faith in the execution of their duties, as well as not to engage intentionally, recklessly or with gross negligence in any misconduct with regard to their responsibilities. The Defendants have engaged in a continuing course of conduct constituting breaches of fiduciary duty amount to equitable fraud by (a) allowing defendant Shi, his family, and his friends, and other Suntech executives to use Suntech as a vehicle for their own personal financial benefit; (b) failing to seek redress for Suntech from Shi; (c) negligently and/or recklessly determining that related party

transactions on terms unfavorable to Suntech should be approved; and/or (d) abdicating their responsibility to monitor related party transactions.

210.    To discharge these duties, the Defendants were required to exercise reasonable and prudent oversight of the management, policies, practices, and controls of Suntech, and to ensure that Suntech conducted its business in compliance with all applicable laws and professional guidelines. By reason of their positions and because of their ability to control the business and corporate affairs of Suntech at all relevant times, the Defendants owed to the Company and to its stockholders fiduciary obligations of due care, loyalty, prudence, candor and diligence, and to act in furtherance of the best interests of the Company and its stockholders. By virtue of this obligation of due care, loyalty, prudence, candor and diligence, the Defendants were required, among other duties and obligations:

(a) to act honestly, candidly and in good faith with a view to the best interests of the Company;

(b) to exercise the care, diligence and skill that a reasonably prudent person would exercise in comparable circumstances;

(c) to manage, conduct, oversee and direct the employees, business, and affairs of Suntech in accordance with state and federal laws and regulations;

(d) to exercise reasonable control and oversee the officers, employees and agents of Suntech;

(e) to ensure the prudence and soundness of the policies and practices undertaken or proposed to be undertaken by Suntech;

(f) to remain informed as to how Suntech was, in fact, operating, and, upon receiving notice or information of an imprudent or unsound decision, condition, or practice, to make a reasonable investigation in connection therewith and to take steps to correct that decision, condition, or practice;

 (g) to conduct the affairs of the Company in an efficient manner in order to maximize profits to Suntech's stockholders;

(h) to execute their duties as officers and directors of Suntech in accordance with their duty of loyalty to the Company and its shareholders; and

(i) not to engage in any intentional, reckless, illegal, fraudulent or *ultra vires* misconduct or acts in their capacity as directors of Suntech.

211.   The Defendants did, in fact, engage in conduct specifically in violation of their duties set forth above by, among other things, the following:

(a)   knowingly, recklessly or in gross negligence causing Suntech to engage in related party transactions;

(c) failing to oversee adequately the use of Company funds to ensure that they were not used for the personal benefit of defendant Shi other Suntech executives or any individual defendants;

(d) failing to take action to correct the improper practices complained of herein, and/or concealing, directing and/or encouraging such practices;

212.   Each of the Defendants, individually or jointly, as herein alleged, by acquiescing, approving and/or directing decisions to further their own personal financial interests and by concealing the true financial condition of Suntech, committed one or more of the acts or omissions to act, which constituted equitable fraud, waste of corporate assets, mismanagement, gross negligence, and/or violations of their fiduciary duties. Each of the Defendants knowingly, recklessly, or in gross negligence, ignored information giving rise to an obligation to seek information regarding (among other things) defendant Shi's and other Suntech executives' personal use of Suntech's funds and the accurate reporting of Suntech's financial condition, and to take affirmative steps in a good faith effort to remedy this improper conduct.

213.    As a direct and proximate result of Defendants' failures to exercise due care, candor and loyalty in the performance of their duties, as alleged herein, Suntech has engaged in imprudent, unlawful, and fraudulent activities, all of which have caused and will continue to cause significant losses to Suntech. In addition, Defendants have permitted Suntech to enter into related party transactions that have imposed significant costs to Suntech and, because Suntech's purported obligation is continuing, will continue to impose significant costs on Suntech. By reason of Defendants' misconduct as set forth above, Suntech has suffered and will suffer damages, in an amount not presently determinable, but which is expected to be at least in the

hundreds of millions of dollars. The Defendants cannot defend their actions as within their business judgment.

214.    The allegations herein demonstrate a sustained and systematic failure by the defendants to fulfill their fiduciary duties. There is no independent organ within Suntech to which Plaintiff can turn to obtain redress for the claims asserted herein. The wrongdoers have been and continue to be in control of Suntech and will not permit Suntech to pursue the claims alleged herein against Shi and Suntech's former and current Board of Directors in order to protect their own personal interests, including the avoidance of personal liability and the preservation of the appearance of credibility which the individual defendants would sacrifice if they permitted Suntech to prosecute the claims alleged herein.

215.    As a result of the misconduct alleged, the Defendants are liable to the Company in damages.

216.    This action is brought less than six years after the discovery of the breaches of fiduciary duty and of equitable fraud.

**COUNT II**
**CLAIM FOR WASTE OF CORPORATE ASSETS AND EQUITABLE FRAUD**
**(Against all Defendants)**

217.    Plaintiff incorporates by reference all paragraphs set forth above.

218.    At the direction of, or with the approval of the Defendants who have been and continue to be in control of Suntech, Suntech has engaged in a continuing pattern and practice of wasting corporate assets, as alleged herein.

219.    Corporate waste occurs when a corporation is caused to effect a transaction on terms that no person of ordinary, sound business judgment could conclude represents a fair exchange. The Defendants have engaged in a continuing course of corporate waste, including failing to seek recovery for Suntech of, among other things, the waste of corporate assets which occurred under defendant Shi and the former Board. The Defendants are also engaging in corporate waste by preventing Suntech from suing Shi and each of the defendants to recover for the damages they have caused to it. By reason of the Defendants' misconduct, Suntech has

incurred significant expenses, liabilities, and obligations for the benefit of the Defendants and has been injured thereby.

220. This action is brought less than six years after the discovery of the corporate waste

**WHEREFORE**, Plaintiff demands judgment as follows:

A. Against all defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the breaches of fiduciary duty and waste of corporate assets by the individual defendants;

B. Injunctive and declaratory relief precluding the continuation of the wrongs alleged herein;

C. Awarding to plaintiff the costs and disbursements of the action, including reasonable attorney's fees, accountants' and experts' fees, costs and expenses; and

D. Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: June 7, 2013

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

/s/ Phillip Kim
Laurence M. Rosen, Esq. (SBN 219683)
Phillip Kim (pro hac vice)
Jonathan Horne
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
lrosen@rosenlegal.com
pkim@rosenlegal.com
jhorne@rosenlegal.com

Counsel for Plaintiff

<u>VERIFICATION</u>

I, Kent Ji, am the plaintiff in the within action and am a citizen of the State of Oregon. I have read the foregoing complaint and know the contents thereof. The allegations of the complaint are true of my personal knowledge, except as to the matters therein stated to be alleged on information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 7th of June, 2013.


_____
Kent Ji

**PROOF OF SERVICE BY ELECTRONIC POSTING PURSUANT TO NORTHERN**

**DISTRICT OF CALIFORNIA LOCAL RULES AND LOCAL CIVIL RULE 5-1**

I, the undersigned, say:

I am a citizen of the United States and am admitted to practice in this matter pro hac vice. I am over the age of 18 and not a party to this action. My business address is 275 Madison Avenue, 34th Floor, New York, New York 10016.

On June 12, I caused to be served the preceding document, titled Corrected Verified Amended Shareholder Derivative Complaint for Breach of Fiduciary Duty, by posting the document to the ECF Website of the United States District Court for the Northern District of California, for receipt electronically by the parties as reflected on the attached Court's Service List.

I certify under penalty of perjury that the foregoing is true and correct.

Executed on June 12, 2013, in New York, New York.

/s/ Phillip Kim

Phillip Kim

**3:12-cv-06409-JST** Ji et al v. Shi et al
Jon S. Tigar, presiding
**Date filed:** 12/18/2012
**Date of last filing:** 05/29/2013

# Attorneys

**H. Miriam Farber**
Shearman and Sterling, LLP
599 Lexington Ave.
New York, NY 10022
212-848-5156
mfarber@shearman.com
*Assigned: 03/13/2013*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

representing

**Suntech Power Holdings Co., Ltd**

*(Plaintiff)*

**Jerome Fortinsky**
Shearman and Sterling, LLP
599 Lexington Ave.
New York, NY 10022
212-848-4900
jfortinsky@shearman.com
*Assigned: 03/19/2013*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

representing

**Suntech Power Holdings Co., Ltd**

*(Plaintiff)*

**Stephen D. Hibbard**
Shearman & Sterling LLP
4 Embarcadero Center
Suite 3800
San Francisco, CA 94111
415/616-1100
415/616-1199 (fax)
shibbard@shearman.com
*Assigned: 01/24/2013*
*ATTORNEY TO BE NOTICED*

representing

**Suntech Power Holdings Co., Ltd**

*(Plaintiff)*

**Phillip C Kim**
The Rosen Law Firm, P.A.
275 Madison Avenue, 34th Floor

New York, NY 10116
212-686-1060
212-202-3827 (fax)
pkim@rosenlegal.com

representing

**Kent Ji**
*(Plaintiff)*

*Assigned: 05/06/2013*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Laurence M Rosen**
The Rosen Law Firm. P.A.
355 South Grand Avenue
Suite 2450
Los Angeles, CA 90071
213-785-2610
213-226-4684 (fax)
lrosen@rosenlegal.com
*Assigned: 12/18/2012*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

representing

**Kent Ji**
*(Plaintiff)*

**Laurence M. Rosen**
The Rosen Law Firm, P.A.
355 South Grand Avenue
Suite 2450
Los Angeles, CA 90071
213-785-2610
213-226-4684 (fax)
lrosen@rosenlegal.com
*Assigned: 05/08/2013*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

representing

**Kent Ji**
*(Plaintiff)*

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 06/07/2013 17:09:46 | | | |
| **PACER Login:** | lr0222 | **Client Code:** | STP JH |
| **Description:** | Attorney List | **Search Criteria:** | 3:12-cv-06409-JST |
| **Billable Pages:** | 1 | **Cost:** | 0.10 |